IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF EDGUIN D. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF EDGUIN D. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MERCED D., APPELLANT.

Filed August 24, 2021.    Nos. A-21-184 through A-21-186, A-21-197.

Appeals from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Affirmed.

Derek L. Mitchell for appellant.

Michael R. Johnson, Deputy Dawson County Attorney, for appellee.

R. Hayley Huyser, of Hart & Huyser, P.C., L.L.C., guardian ad litem.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Merced D. appeals the termination of his parental rights to his four minor children. He contends that the Dawson County Court, sitting in its capacity as a juvenile court, erred in terminating his parental rights pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 2016) and in finding that termination was in the minor children's best interests. For the reasons set forth herein, we affirm.

- 1 -

## STATEMENT OF FACTS

Merced is the natural father of the four children who are the subject of these consolidated appeals: Giovanni D., born in June 2005; Edguin D., born in November 2006; Mercedes D., born in November 2009; and Oliver D., born in October 2014. The children's mother was also part of the adjudication/termination process; however, she passed away in January 2020.

On January 2, 2019, Edguin, Mercedes, and Oliver were removed from their mother's care based upon allegations of neglect and abuse by the mother. At the time of the three children's removal, Merced was not living in the home with the mother and children and Giovanni was residing with his maternal grandmother in Texas. On January 3, the State filed adjudication petitions for Edguin, Mercedes, and Oliver alleging that they were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) in that the children lacked proper parental care by reason of the fault or habits of their parent; whose parent neglected or refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of the juveniles; or who are in a situation or engage in an occupation dangerous to life or limb or injuries to the health or morals of such juveniles. In February, the court adjudicated Edguin, Mercedes, and Oliver as being children within the meaning of § 43-247(3)(a) pursuant to their mother's admission to the allegations contained in the adjudication petition. After removal, Edguin, Mercedes, and Oliver remained in out-of-home placements for the entirety of this case.

On April 5, 2019, Giovanni returned to Nebraska from Texas and was promptly removed from his mother's care based on the allegation that his mother was unable to meet his basic needs for food, clothes, and medical care. On April 8, the State filed a petition for adjudication regarding Giovanni alleging that Giovanni was a child as defined in § 43-247(3)(a) for the same reasons as listed for his siblings with an additional allegation that he was "homeless or destitute, or without proper support through no fault of [his] parent, guardian, or custodian." On May 1, Giovanni was adjudicated as being a child within the meaning of § 43-247(3)(a) pursuant to his mother's admission to an amended adjudication petition which struck the allegation that Giovanni was homeless or destitute, or without proper support through no fault of his parent. After his removal, Giovanni remained in out-of-home placement for the entirety of this case.

At the commencement of the adjudication proceedings in January 2019, Merced was not served with the petitions in these cases because his whereabouts were unknown. Despite this, an attorney was appointed to represent Merced and Merced has been represented by an attorney at all stages of these proceedings. In May, Merced was located in Texas. He had left Nebraska in November 2018 due to pending criminal charges of felony driving under the influence and misdemeanor transporting a child while intoxicated which were the result of him picking up one of his children from school while drunk. After Merced left Nebraska, a warrant was issued for his arrest. Merced returned to Nebraska in December 2019 and attended the December 17 permanency hearing. Shortly after the permanency hearing, Merced turned himself in on the outstanding warrant and he was incarcerated from December 19, 2019, through January 3, 2020. After violating his conditional release, Merced was incarcerated again from March 19 through March 27. On March 27, Merced was placed on 24 months' probation for his conviction for second offense driving under the influence. As part of that probation sentence, Merced was regularly tested for drugs and alcohol. Merced had three positive tests for alcohol between late August and late

September 2020. Merced was then placed on a CAM device during which time he had confirmed positive alcohol test and a confirmed alert in October along with some alerts for tampering.

Merced personally appeared at the January 8, 2020, permanency and review hearing. At that time, specific case plan goals for Merced were adopted including that he (1) cooperate and communicate with DHHS in order to fully address and evaluate his strengths and needs; (2) ensure he was meeting his own mental health needs as evidenced by submitting to a psychological evaluation/mental health evaluation and following all the recommendations provided by the psychologist; (3) refrain from any illegal drug usage and address any drug issues as evidenced by submitting to drug tests, having zero positive results, completing a drug and alcohol evaluation, and following the recommendations made from the drug and alcohol evaluation; (4) improve his parenting skills by participating in scheduled visitations, participating in scheduled family support services, providing age appropriate supervision during visitation, identifying appropriate consequences and rewards for the children, and showing consistency in expectations and routine; and (5) maintain and meet the basic needs of his children by having his own home, keeping it clean and drug-free, ensuring only appropriate people are in the home, making sure all utilities were paid monthly, obtaining and maintaining employment, and developing and following a budget.

In October 2020, petitions for termination were filed regarding all four children alleging that termination of Merced's parental rights was proper pursuant to § 43-292(2), (6), and (7), and that termination was in each of the minor child's best interests. The termination hearing was held on December 9 and 18. The State called three witnesses: Jason Dillard, a therapist for Edguin, Mercedes, and Oliver; Myriam Palacios, Department of Health and Human Services (DHHS) case manager from January 2, 2019, through February 10, 2020; and Amanda Leighton, DHHS permanency worker from February 10 through the termination hearing. Merced testified on his own behalf and called several witnesses including Carlos Palacios (Carlos), a family support provider/visitation supervisor.

### DILLARD

Dillard, a licensed mental health therapist, served as a therapist for Giovanni, Edguin, and Mercedes. Dillard did not serve as Oliver's therapist due to Oliver's young age and the scope of his issues; Oliver participated in only one family session. According to Dillard, during that session, Oliver stood right next to his mother, did not talk or make eye contact, and rarely moved. Dillard explained that Oliver was displaying significant signs of neglect and it made Dillard "uncomfortable seeing how far behind [Oliver] . . . seemed at that time, developmentally."

Dillard was Edguin's therapist from January through October 2019. In late January, Dillard noted that Edguin had experienced significant trauma as evidenced by his mood, minimal eye contact, and "looking at the ground for the majority of the session." Dillard opined that there were some "very unstable home environments" due to comments made by Edguin during his session. Edguin stated that his mother hit him with a closed fist or open hand at least once per week. Dillard worked with Edguin on feeling safe and secure. Although Edguin initially made progress, in the fall of 2019, he was displaying concerning behaviors. As a result of Edguin's behaviors, including aggression toward his foster mother, which were becoming a significant safety concern and the fact that Edguin's needs could no longer be met at the outpatient level, Dillard recommended

placing Edguin at the Boys Town psychiatric residential treatment facility which provided "a much more structured environment in order to help him control his behaviors while, at the same time, meeting the significant trauma symptoms he was displaying."

Dillard served as Mercedes' therapist from January to May 2019. Dillard stated that Mercedes "had absolutely been a witness to some significant physical trauma, and she had experienced physical trauma herself." Mercedes told Dillard that she and her brothers did not like returning home after school because "they never knew if their mother was going to be in a bad mood" and that her mother used a lamp cord to hit her. Dillard also reported that Mercedes stated that Edguin was hit "quite often."

Dillard served as Giovanni's therapist from April 2019 through July 2020. He explained that Giovanni suppressed his emotions and was behind academically so they worked on processing and understanding Giovanni's trauma and learning how to clearly communicate what he is thinking and feeling. Giovanni expressed that he wanted to be with his siblings regardless of where they were placed.

Dillard expressed that safety, stability, and a sense of permanency are very important for the well-being of children, especially children who are in foster care. He also stated that children who remain in foster care for a significant amount of time begin to wonder if they'll ever see their parents again or if they'll ever be loved again. When they don't have that finalization of yes or no, whether they'll be placed with their parents or they'll be placed in an adoption, then it's a constant state of anxiety for them. And a lot of times it can, in itself, be traumatic for the kids.

PALACIOS

Palacios, the first caseworker in this case, testified that, on May 2, 2019, she located Merced in Texas. From May to December, Palacios and Merced had telephone contact one or two times per month. Additionally, Merced maintained at least weekly telephone contact with the children during this time. Palacios' first face-to-face contact with Merced was at the December 17, 2019, permanency hearing. At the time of that hearing, Edguin, Mercedes, and Oliver had been in out-of-home placement for nearly 12 months, and Giovanni had been in out-of-home placement for nearly 9 months. She and Merced developed case plan goals which included that Merced needed to address his mental health needs, complete a substance abuse evaluation, refrain from using illegal substances, improve his parenting skills, and meet and maintain his children's basic needs. Palacios testified that although Merced's legal issues affected his ability to work on his case plan goals, he did not show progress on improving his parenting skills. Further, although Palacios encouraged Merced to write letters to his children while he was in Texas, Palacios did not believe that Merced wrote any letters to his children. However, Merced did ask how his children were doing on a regular basis and expressed concern for them. Palacios noted that Merced predominately speaks Spanish and the children predominately speak English.

Palacios expressed that "[w]ith the knowledge that I had when I was caseworker, I would say that the children would benefit from permanency in the form of adoption. I don't know how things are going now or have been going for Merced, so I don't have an opinion of that." She further testified that it concerned her that the children had been in out-of-home placement for 23 months for Edguin, Mercedes, and Oliver, and 20 months for Giovanni because "[i]f Merced would

have been making enough progress on his case plan goals and been consistent, I believe that this should be right around when the kids should be reunified." She further testified that it was in the children's best interests to have permanency.

LEIGHTON

In February 2020, Leighton, a DHHS permanency worker, took over the case from Palacios. Leighton testified that she spoke with Merced at least once per month and that they attended virtual family team meetings. After Merced participated in a therapeutic session with the children on March 11, 2020, one in-person visit occurred. After that visit, other visits had to occur virtually for the remainder of March and April due to COVID-19 precautions. Leighton testified that, although the visitation provider returned to in-person visits in May with a mask requirement and that arrangements could have been made for Merced to have in-person visits at that time, Merced's in-person visits did not resume until September 2020. Leighton testified that Merced was allowed 3 hours of virtual visitation per week and in-person visitation at Boys Town for 2 hours per month. According to Leighton, Merced was offered an increase in virtual and in-person visits with his children in 2020 because that would help strengthen their bond and would allow the family support worker to determine if Merced's parenting skills had improved, but Merced declined due to his work schedule. Merced never requested additional visitation.

Leighton explained that although Merced participated in visitation, there has been "no progress in in-person visitation or really any growth in parenting." Leighton testified that Merced had shown limited progress in the virtual visits because there is

> [v]ery little communication, little interaction. A lot of the notes indicate that it's the children playing around, chasing each other around with the iPad, Mercedes encouraging . . . her siblings to participate. Gio[vanni] rarely participates in visitation. Oliver, of course, who's in and out. He's active. He's busy. It's mostly [Merced] observing playtime with the children, as the notes indicate.

According to Leighton, Merced is deficient in his parenting skills and his ability to meet the children's emotional and physical needs, noting that

> [s]ince the beginning of the case, when the children were left with the alleged abusive parent at the time, that was failure to protect. He did not come back to protect them. Did not remove them from that dangerous situation. On top of the not knowing his parenting skills, that to me is a concern, not recognizing that they were not safe in that situation. Since that time, he has not had consistent contact with them in person. I don't know what his protective skills would be.

Leighton also testified that Merced has complied with case plan goals of completing a substance abuse evaluation, working with probation, complying with testing, attending therapy, maintaining employment, maintaining stable housing, developing a budget, and attending team meetings. Further, although Merced sometimes complied with the requirement that he abstain from substance abuse and alcohol, he has relapsed in his alcohol use. Leighton further acknowledged that Merced had completed some probation classes involving self-control and social values "that

maybe would strengthen [his] parenting skills," but he had not taken an actual parenting class and none of Merced's compliance where he did make some progress related to raising four children.

Leighton expressed that DHHS neither attempted, nor has made plans, to place the children with Merced because

> [t]here's been no evidence of [Merced's] parenting skills. I don't know that he could ensure their safety or well-being or that he could meet their needs. There's nothing that has been accomplished in that. I guess the two years, nearly, that the children have been in care, . . . [and] almost a year . . . that I've been on the case, [there has been] no progress in case plan goals to move towards reunification or even semi-supervised visitation.

Leighton expressed additional concerns including that Merced was not present at the time of the children's removal, he was absent in these cases for about 12 months before he made an appearance, and he left the children with a parent that may have traumatized them. She stated that, before DHHS could return the children to Merced, it would need to see "more . . . healthy interaction between [Merced] and all the children, progress from there to some semi-supervised time, and then, maybe some unsupervised time going from there. [DHHS] would need to see that [Merced] can provide the basic needs for his children and do so safely and consistently."

Leighton further testified that reunification with Merced was not feasible because

> [a]t this point in the case, the children need permanency. They need that stability. And that can be found through adoption. I don't believe that it would be in their best interest[s] to start moving them back . . . since they've had an appropriate home, putting them back in that home, and going back and forth from the stable foster home to where [Merced] might be in his efforts at reunification. At this time in the case, they need stability.

Leighton opined that termination of Merced's parental rights was in the best interests of the children because she had not "seen evidence of his ability . . . to parent or provide for the children for any consistent, substantial amount of time."

### MERCED

Merced testified on his own behalf stating that prior to leaving for Texas in November 2018, he lived separately from the mother and children because he and the children's mother argued and she had stabbed him with a knife in June 2018. However, Merced stated that "[a]lmost every day I would go to the house." Merced testified that he knew the mother "would correct them and hit them sometimes, but I didn't know she treated them so extreme." He admitted that he knew that leaving the children with their mother "wasn't a safe situation . . . and I know that I did wrong in leaving them with her."

Merced testified that he became aware that his children were in State custody in mid-2019 and, since that time, he has been in contact with DHHS for monthly team meetings and "whenever any concerns with the children arise" and that he has been in regular telephone contact with the children. Merced returned to Nebraska on December 16, 2019.

Merced testified that he wanted more time to reunite with his children and increased in-person visitation. He further denied that DHHS had offered him more visitation time stating "If they offered it, they didn't tell me." He further denied that he had told DHHS that he was working a lot and did not have time for increased visitation. Merced further testified that the only time that he had parented the children by himself was when the mother was arrested for stabbing him and the children were only in his care for a month or less and, during that time, the children's grandparents were helping him with the children.

CARLOS

Carlos testified on Merced's behalf stating that he has been the family support worker supervising Merced's visitation since February 2020. Merced has 1-hour visits three times per week. Carlos expressed that Merced's interaction with the children has progressed and the visits have become better. Carlos expressed that he thinks "Merced is a great dad." However, he admitted that virtual visitation was not a very meaningful assessment tool and that, although he was conducting in-person visitations with other families, Merced's visits took place virtually.

TERMINATION ORDER

In its February 2021 order, the county court found that the State had met its burden of proof to support termination of Merced's parental rights pursuant to § 43-292(2), (6), and (7), and that termination was in the minor children's best interests. Specifically, the court found:

> In the present case, [Merced] was absent for the first 11 ½ months of the case (and 8 ½ months of Giovanni's case) , and made no attempts to return to Nebraska and work to rehabilitate himself. After his return he has made no significant progress in meeting the goals of his case plan and remedying the conditions which led to the removal of the children. Due to lack of progress in addressing his sobriety and improving his parenting skills his visitation has not increased. The court finds that it is not in the children[s'] best interests that they be returned to the custody of [Merced] at this time. He is far from ready for reunification with his children, and the evidence shows that it would be a long time, if ever, before he has made sufficient improvement to allow for reunification. Based on a totality of the evidence, the court further finds that [Merced] does not have a significant emotional bond with the children and that [Merced] does not have sufficient insight or parenting skills to help the children address the trauma which they all have experienced. The court finds that [Merced] has never had sole care or custody of the children for any significant period of time, and has not demonstrated his ability to properly do so.
>
> . . . Additionally, this court finds that the State has rebutted the presumption that [Merced] is a fit parent. The State has demonstrated by clear and convincing evidence that [Merced] is unfit by his failure to improve his parenting skills, his failure to maintain his sobriety, and his neglect of the children, and that his personal deficiencies are such that they will prevent him from reasonable performance of his parental obligations in the future. The unfitness of [Merced] has been proven, by clear and convincing evidence, to be a detriment to each of the children's health and well-being.

Merced has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Merced's assignments of error, consolidated and restated, are that the court erred in terminating his parental rights pursuant to § 43-292(2) and (6) and in finding that termination was in the minor children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id*.

## ANALYSIS

### STATUTORY BASIS FOR TERMINATION

Merced first argues that there was insufficient evidence to terminate his parental rights under § 43-292(2) and (6). The county court found that the State has presented clear and convincing evidence to support termination pursuant to § 43-292(2), (6), and (7). Upon our de novo review, we affirm the decision of the juvenile court; specifically, we find the evidence clearly and convincingly established the children were in out-of-home placements for at least 15 of the most recent 22 months, as required by § 43-292(7).

Section 43-292(7) grants termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra.*

In this case, the record contains undisputed evidence that Edguin, Mercedes, and Oliver were removed from their mother's care on January 2, 2019, and that they each resided in out-of-home placements throughout the entire proceedings. Giovanni was removed from his mother's care on April 5, 2019, and remained in out-of-home placement throughout the entire proceedings. As a result, at the time of the State's filing its motions to terminate Merced's parental rights in late October 2020, Edguin, Mercedes, and Oliver had each been in out-of-home care for 21 months and Giovanni had been in out-of-home care for 18 months. Therefore, the circumstances required by § 43-292(7) were met, as the State's evidence proved the children had been in out-of-home placements for at least 15 of the most recent 22 months.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that each of the children had been in

an out-of-home placement for 15 or more of the most recent 22 months, statutory grounds for termination of Merced's parental rights exist.

BEST INTERESTS

Merced assigns that the juvenile court erred in finding that it was in the children's best interests to terminate his parental rights. In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Becka P. et al., supra*. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). In cases where termination of parental rights is based solely on § 43-292(7), the Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is, in fact, in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). In such a situation, because the statutory ground for termination does not require proof of such matters as abandonment, neglect, unfitness, or abuse, as the other statutory grounds do, proof that termination of parental rights is in the best interests of the child will require clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292. *In re Interest of Aaron D., supra.*

The children involved in this case are Giovanni (15 years old), Edguin (14 years old), Mercedes (11 years old), and Oliver (6 years old). At the time of the termination hearing, Edguin, Mercedes, and Oliver had been in out-of-home placement for 23 months and Giovanni had been in out-of-home placement for 20 months. During the children's placements, Merced's whereabouts were unknown for the first 4 months of the case. Although Merced learned that his children were in out-of-home placements in May 2019, he did not return to Nebraska until December. After Merced returned to Nebraska, his visits with the children never progressed beyond supervised visits. Although in-person visits were converted to virtual visits in March and April 2020 due to the COVID-19 pandemic and in-person visits resumed in May, Merced continued virtual visits until September.

Although Merced has completed some of his case plan goals, he has not put himself in a position to parent his children and the evidence reflects that it would be a long time, if ever, before he has made sufficient improvement to allow reunification. He has never demonstrated an ability to care for his children on his own and admitted that he has never cared for the children by himself. Further, Merced allowed three of his children to remain in an abusive situation with the mother even though he knew that it "wasn't a safe situation . . . and I know that I did wrong in leaving them with her."

More specifically, the evidence clearly and convincingly demonstrates that Merced knew his children were being abused by their mother and were not in a safe situation, but did nothing to assist them. In fact, Merced acknowledged that he removed himself from the situation due to concerns for his own safety. The result of leaving his children in an abusive situation was predictable. Each child demonstrated the ill effects of long-standing trauma and exhibited the need for extensive therapy in order to deal with that trauma. Once Merced learned that the children had been removed by the State, he waited a significant amount of time before even returning to Nebraska, demonstrating that he placed his own needs above those of the children. And although Merced was provided with significant services in an attempt to reunify him with his children, he made minimal progress with his own personal needs and virtually no progress in addressing his ability to parent his children.

Although we have no doubt of Merced's love for his children, the evidence adduced establishes that he is unfit to care for them and will be unable to do so for the foreseeable future and that this failure is detrimental to the children's well-being. The evidence also shows that the children have made strides while in the care of their foster parents. Edguin, Mercedes, Oliver, and Giovanni deserve permanency. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of parental rights; children cannot, and should not, be suspended in foster care or be made to wait uncertain parental maturity. *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). Accordingly, we find there was clear and convincing evidence to establish that Merced is unfit and that terminating his parental rights is in the children's best interests.

CONCLUSION

Based upon our de novo review of the record, we find that there was sufficient evidence to support the termination of Merced's parental rights. Accordingly, the order of termination is affirmed.

AFFIRMED.